## THE TEXAS.

(District Court, S. D. New York. January 20, 1905.)

SHIPPING—REGULATION OF STEAM PASSENGER VESSELS—VIOLATION OF STAT-
UTE PROHIBITING CARRIAGE OF GASOLINE.

Rev. St. § 4472, prohibits passenger steamers from carrying as freight
certain articles, including petroleum products or other like explosive fluids,.
except in certain cases and under certain restrictions. By Act Feb. 20,
1901, c. 386, 31 Stat. 799 [U. S. Comp. St. 1901, p. 3050], the section was
amended by adding the following provision: "Nothing in the foregoing
or following sections of this act shall prohibit the transportation by
steam vessels of gasoline or any of the products of petroleum when car-
ried by motor vehicles (commonly known as automobiles) using the same
as a source of motive power: Provided, however, that all fire, if any, in
such vehicles or automobiles be extinguished before entering the said ves-
sel and the same be not relighted until after said vehicle shall have left
the same. * * *" Held, that gasoline contained in the tank of an au-
tomobile being transported on a steam vessel was carried as freight,
within the meaning of the statute; that an automobile in which the mo-
tive power was generated by passing an electric spark through a com-
pressed mixture of gasoline and air in the cylinder, causing intermittent
explosions, carried a fire while the vehicle was under motion from its own.
motive power; and that the carrying by a steam ferryboat of such a
vehicle, which was run on and off the boat under its own power, was a
violation of the statute.

In Admiralty. Libel for penalty for transportation by ferryboat of
gasoline automobile without extinguishment of fire.

Henry L. Burnett, U. S. Atty. (Ernest E. Baldwin, Asst. U. S..
Atty., of counsel), for libellant.

Wilcox & Green (Herbert Green and John C. Higdon, of counsel),.
for claimant.

ADAMS, District Judge. This action was brought by the United
States to recover against the ferryboat Texas a penalty of $500 for
transporting an automobile across the East River on the 14th day of
October, 1904, under section 4472 of the Revised Statutes of the United
States as amended by Act Cong. Feb. 27, 1877, c. 69, 19 Stat. 252,
and Act Feb. 20, 1901, c. 386, 31 Stat. 799 [U. S. Comp. St. 1901, p.
3050], and section 4499 of the same [U. S. Comp. St. 1901, p. 3060].
These sections provide:

"Sec. 4472 (as amended 1877, 1901). Dangerous articles not to be carried
on passenger steamers; (gasoline, etc., in automobiles).

No loose hay, loose cotton, or loose hemp, camphene, nitro-glycerine, naptha,
benzine, benzole, coal-oil, crude or refined petroleum, or other like explosive
burning fluids, or like dangerous articles, shall be carried as freight or used
as stores on any steamer carrying passengers; nor shall baled cotton or hemp
be carried on such steamers unless the bales are compactly pressed and thor-
oughly covered with bagging of similar fabric, and secured with good rope
or iron bands; nor shall gunpowder be carried on any such vessel, except
under special license; nor shall oil of vitriol, nitric or other chemical acids.
be carried on such steamers except on the decks or guards thereof, or in such
other safe part of the vessel as shall be prescribed by the inspectors. Refined
petroleum, which will not ignite at a temperature less than one hundred and
ten degrees of Fahrenheit thermometer, may be carried on board such steamers
upon routes where there is no other practicable mode of transporting it, and
under such regulations as shall be prescribed by the board of supervising:

inspectors with the approval of the Secretary of the Treasury; and oil or spirits of turpentine may be carried on such steamers when put up in good metallic vessels, or casks or barrels well and securely bound with iron and stowed in a secure part of the vessel; and friction matches may be carried on such steamers when securely packed in strong tight chests or boxes, the covers of which shall be well secured by locks, screws, or other reliable fastenings, and stowed in a safe part of the vessel at a secure distance from any fire or heat. All such other provisions shall be made on every steamer carrying passengers or freight, to guard against and extinguish fire, as shall be prescribed by the board of supervising inspectors, and approved by the Secretary of the Treasury. Nothing in the foregoing or following sections of this act shall prohibit the transportation by steam vessels of gasoline or any of the products of petroleum when carried by motor vehicles (commonly known as automobiles) using the same as a source of motive power: Provided, however, that all fire, if any, in such vehicles or automobiles be extinguished before entering the said vessel, and the same be not relighted until after said vehicle shall have left the same: Provided, further, that any owner, master, agent, or other person having charge of passenger steam vessels shall have the right to refuse to transport automobile vehicles the tanks of which contain gasoline, naptha, or other dangerous burning fluids."

"Sec. 4499. Penalty for failure to comply.

If any vessel propelled in whole or in part by steam be navigated without complying with the terms of this title, the owner shall be liable to the United States in a penalty of five hundred dollars for each offense, one-half for the use of the informer, for which sum the vessel so navigated shall be liable, and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the offense."

The allegation of the libel is:

"Sixth: That on said day, to wit, the 14th day of October, 1904, at about 10:28 o'clock in the morning, said ferryboat, being on one of her regular trips on the East River between said ferry termini, and having passengers on board, carried as freight, across the East River, from the foot of East 23rd Street, Borough of Manhattan, to the foot of Broadway, in the Borough of Brooklyn, New York City, a quantity of gasoline, the same being an explosive burning fluid, which fluid was contained in a tank or other receptacle attached to and forming a part of a motor vehicle commonly known as an automobile, which vehicle was numbered 11,119; that said vehicle used the said gasoline as a source of motive power, and there was at said time, a fire in said vehicle which was not extinguished before said vehicle entered said vessel at said East 23rd Street and was relighted before said vehicle left said vessel at the foot of said Broadway."

The answer denies some of the material allegations of the libel in the following language:

"Sixth: Denies that the gasoline mentioned in the sixth article of the libel was carried by the ferryboat Texas as freight; also denies that there was a fire in the motor vehicle therein mentioned which was not extinguished before the vehicle entered the vessel on the occasion referred to in said article, denies that a fire was relighted in said vehicle before it left the vessel at the foot of Broadway, Brooklyn, and also denies that there was any fire whatsoever in said vehicle on said occasion; and admits the remaining allegations contained in the sixth article of the libel."

The answer further alleges:

"Ninth: Further answering, claimant alleges, upon information and belief, as a distinct and separate defense:

Section 4472 of the Revised Statutes, which incorporated an act of Congress of February 28, 1871, originally contained no reference whatsoever to automobiles or motor vehicles, but by an amendment which became a law February 20, 1901, the following was added thereto, which appears in said section of the Revised Statutes as set forth at length in article fourth of the libel:

'Nothing in the foregoing or following sections of this act shall prohibit the transportation by steam vessels of gasoline or any of the products of petroleum when carried by motor vehicles (commonly known as automobiles) using the same as a source of motive power: Provided, however, that all fire, if any, in such vehicles or automobiles be extinguished before entering the said vessel, and that the same be not relighted until after said vehicle shall have left the same: Provided, further, that any owner, master, agent, or other person having charge of passenger steam vessels shall have the right to refuse to transport automobile vehicles the tanks of which contain gasoline, naptha, or other dangerous burning fluids.'

At the time said amendment became a law automobiles or motor vehicles using gasoline as a source of motive power commonly contained a fire giving forth a continuous flame which was essential to the creation of the power used to propel such vehicles.

The motor vehicle or automobile numbered 11,119, referred to in the libel, was equipped with a securely closed metal tank containing not more than 10 gallons of gasoline which was used as a source of motive power for the propulsion of the vehicle. The tank was securely affixed to the rear of the vehicle. The method of producing the power required to propel said vehicle is, and was on said occasion, as follows:

The gasoline is conveyed from the said tank through a metal tube, about ¼ of an inch in diameter, into a metallic device called a carburetter. The flow of the gasoline through this tube is not free, but is checked and controlled by a needle valve. The carburetter consists of two chambers, in the upper of which is a float operating the said needle valve, and said chamber is capable of holding, and does hold, not more than a gill of gasoline. The gasoline is discharged from said chamber, a drop at a time, into the lower or mixing chamber of the carburetter. The mixing chamber is filled with warm air, and as the gasoline enters it becomes vaporized and forms an explosive mixture. By the operation of the piston which runs the vehicle, this mixture is drawn into the cylinder of the motor. The cylinder is made of forged steel surrounded by a water tight jacket in which water is kept cool by constant circulation. The said mixture is compressed in the cylinder by the return stroke of the piston, and at the point of greatest compression is exploded by the passage of a succession of electric sparks through it. Such explosions force the piston forward, and the piston transmits its motion through a crank shaft to the running gear, which is thereby operated. The electric sparks are produced by a small battery or dynamo, the current from which is instantly made and instantly broken.

On the occasion mentioned in the libel, and while the ferryboat lay in its slip at East 23rd Street, Manhattan, made fast to the ferrybridge, the vehicle entered the ferryboat, and traversed the length thereof in the horse gangway, under its own power, produced as hereinbefore described, and then, before the ferryboat started on her trip, the said electric current was instantly broken, and said sparking ceased. Said current remained broken, and said sparking suspended, throughout the trip of the ferryboat and until she was made fast to the bridge in her slip at the foot of Broadway, Brooklyn, at the termination of the trip, when said current was again made, and said sparking resumed, for the purpose of permitting the vehicle to leave the ferryboat under its own power."

The allegations of the answer were in substance, admitted to be true.

It was agreed that the type of car, which is the subject of controversy, is known as the Mors automobile, manufactured in France, and consists of four cylinders.

The scientific testimony of two witnesses was taken on the trial on behalf of the Government, but none on the part of the claimant, which apparently was satisfied with the Government's case in such respect. These witnesses were Frederick R. Hutton, Professor of Mechanical Engineering in Columbia University and David S. Jacobus, Professor

of Experimental Engineering at the Stevens Institute of Technology.
Dr. Hutton testified, in substance, as follows:

That when electric sparks were passed through the compressed mix-
ture of gasoline and air, a fire was created; that the result of such
fire was continuous when the car was in motion, and only ceased when
it was still; that every indication of combustion would appear from
the ignition from the sparks, such as the heating of the cylinder and the
necessity of cooling the same by the circulation of water, that the cir-
culation of water was to avoid deformation or working of the cylinders;
that the deposit of lamp black in the cylinders resulted from the burn-
ing of hydro-carbon vapor, and the lamp black was also deposited upon
the spark plugs; that there was frequent combustion in the muffler,
an enlargement of the cross section of the exhaust pipe between the head
of the cylinder of the motor and its outlet, which was designed to re-
duce the noise of the explosions, when for any reason there might be a
failure of ignition in the cylinder and where the flame could be plainly
seen; that leaking gasoline could readily be ignited by a premature
or consequent explosion in the muffler, where the flame might pass
out; that but for the presence of the cooling water jacket, the cylinder
would become red hot at night time and black hot in the day light; that
technically a definition of fire is that it is a source of heat resulting
from a chemical union of combustible material with oxygen at such
a temperature that any solid material in the combination would create
a glow sufficient to emit light; that the operation in the cylinder of
the combustion of gas is fire; that gasoline, a product of petroleum, is
an explosive burning fluid when combined with air; that the ex-
plosions and effect are entirely enclosed and confined excepting so far
as the valves in the head of the cylinder open a communication to the
outer air; that if there should be anything explosive in the muffler or
exhaust pipe the fire would be communicated outwards; that it hap-
pens by no means unfrequently that the mixture of hydro-carbon air—
gasoline and air—which is drawn into the compressing or motor cylinder
in the first stroke, is not fired in the compression, either by the failure
of the spark to pass, or by such properties of the mixture that the flame
is not propagated through it on the passage of the spark; that the
cylinder contents, then, instead of being an incombustible mixture of
exhausted gases, carbonic acid and other gases, is passed into the
exhaust pipe as a mixture of explosive vapor or air; that if the flame
can pass back through the opening of the exhaust valve into the ex-
haust pipe where the mixture lies, it will be set afire by the flame in the
muffler, or in the exhaust pipe, or in any part of the exhaust connec-
tion, making a loud report and if the flame is sufficient the product of
combustion may expel itself through the final outlet of the muffler
or exhaust pipe into the open air; that it would probably not burst
the muffler, because they are usually strong enough to withstand this
pressure, although the bursting of mufflers is not unknown; that in
the hands of competent operators there is not much difference between
gas and steam machines; that when the machine is at rest, the gasoline
explosions cease absolutely and normally everything is closed when the
explosion takes place; that in a four cylinder car there would be an
explosion at every turn of the crank shaft; that when the car is mov-

ing along at even a moderate rate of speed, the time between the explosions in the respective cylinders would be very short; that the hot tube machines, steam cars, giving a steady continuous flame, are in very successful operation.

Dr. Jacobus testified, in substance, as follows:

That he caused to be made a drawing illustrating the kind of engine on the car in this case; that he was present and heard the testimony of Dr. Hutton; that assuming the facts to be true, the operation of passing the electric spark through the explosive mixture would produce a fire; that assuming, for some reason or other, in the opening of the valve when the gas charge exploded, a part of the flame or fire or combustion should come in contact with the mixture in the pipe or muffler, it would then explode; that if the charge was of sufficient strength, it might be ejected as a flame or fire from the end of the muffler and be capable of igniting gasoline or any other product of petroleum or any other body that was inflammable; that he knew the sparks to fail to ignite the gas and danger to arise from the failure; that he had never seen it happen right at the time of cranking the machine but had seen a violent explosion in the muffler; that in starting up a muffler of this class you have to get a compression by hand, the charge has to be taken in and the compression given by your own power and then after the gas is compressed it is ignited by the electric spark; that sometimes too much gasoline gets in with the air, and it will not take fire when the spark goes through it; that he has seen flames shot out of the exhaust pipe on account of the fact that the combustion has not been quite completed before the end of the stroke; that he has seen flames shooting out of the exhaust pipe of a motor of this class; that he considers there is a fire in the cylinder but would not describe it as a continuous fire; that it is intermittent in the ordinary sense of the term; that if a motor of this class were running with a peep hole in it and you asked a popular man whether there was a fire inside the motor, he would look in and see the flame and say there was; that his (the witness') definition of a fire is the heat produced through the combustion of the fuel with oxygen where the temperature is raised so that solid particles brought to that temperature will be luminous; that the chemistry of combustion is very complicated, because we have the disassociation there of the hydrogen from the carbon, and the general theory of a flame, which gives light, is that the particles of carbon which are solid give a glow of light; that with incomplete combustion you get the carbon which is deposited on the walls of the cylinder and the exhaust pipe which is visible to the eye if the cylinder be opened; that the residuum of the combustion in the chamber is of sufficient quantity so that the spark plug has to be taken out and cleaned now and then; that it is deposited on the head of the spark plug and parts that project into the cylinder, so that it can be rubbed off with the finger and the engines have also to be cleaned for the same reason; that the terms flame and fire are not necessarily synonymous, you can have carbon all aglow with no flame to it; that when in technical parlance you use the word fire you do not necessarily mean flame; that the fire in the muffler which might result from insufficient process in the cylinder is the same sort of an explosion or really combustion that you get in the cylinder.

134 F.—58

Dr. Hutton on being recalled, said that there could be fire without flame; that there could be flame without glow as the result of chemical action or union; that flame and fire are not synonymous terms; that you may very easily have a fire without a flame. We are familiar with that in the charcoal fire or in the anthracite fire, where after the first volatile products of the coal have been removed, there is no flame; that on the other hand he thought, there is always fire where there is a flame; that the products of combustion, if the process is normal, should be invisible; that if the process is slightly off normal they become visible.

The libellant contends that but two questions remain for determination: (1) Whether gasoline as carried by the car in this case was freight, and (2) whether in the method of operation, there was a fire as such, which had not been extinguished when the car went on the ferryboat and was relighted before it went ashore.

1. It is urged that if there could have been much doubt as to whether fluid of the character indicated carried on a vehicle in the manner set forth was freight, such uncertainty was removed by the amendment which was passed February 20, 1901, incorporated at the end of section 4472, quoted above, as follows:

"Nothing in the foregoing or following sections of this act shall prohibit the transportation by steam vessels of gasoline or any of the products of petroleum when carried by motor vehicles (commonly known as automobiles) using the same as a source of motive power: Provided, however, that all fire, if any, in such vehicles or automobiles be extinguished before entering the said vessel, and that the same be not relighted until after said vehicle shall have left the same: Provided, further, that any owner, master, agent, or other person having charge of passenger steam vessels shall have the right to refuse to transport automobile vehicles the tanks of which contain gasoline, naptha, or other dangerous burning fluids."

The contention is that the word "freight" in the act is used in the ordinary sense to indicate the cargo, or any part of it, or anything carried for pay, as this car concededly was, and it is a necessary corollary that all of the machine, and everything belonging to it, partook of the same character.

The history of the legislation, now sought to be enforced, is referred to, by which it appears that the amendment of 1901, was the result of an application to Congress for some relief in favor of automobiles. This was granted upon the condition that there should be no fire in the automobiles, desiring to carry the explosive burning fluid, while being carried on steam vessels.

2. On the question of fire, it is urged that the testimony of the witnesses is decisive upon the point; that the conditions existing on the vehicle were not compatible with any other theory than that there was a fire on the car when it entered and left the ferryboat.

The claimant contends:

1. That the gasoline which was being carried on the car, not more than 10 gallons in quantity, was contained in a securely closed metal tank; that it was not freight but was a mere adjunct and incident to the vehicle, which was itself the freight within the meaning of the statute. It is urged that if it is freight, then a cab with lamps carrying kerosene or any other explosive burning fluid is within its prohibition, as so

would be a bicycle, on which there was a lantern, containing kerosene, or a man carrying home a can of kerosene, or a woman who, on returning from shopping, carries home a bundle of cotton batting, or a teamster, whose horse's nose bag contains hay, or matches in the basket of a peddler, or such cases which could be multiplied ad infinitum, all of which, it is said, would be absurd. It is also urged that the construction contended for by the Government would seriously cripple the rapidly growing practice of using automobiles as trucks.

2. That there was no fire in the automobile within the meaning of the statute, nor did the vehicle go aboard the ferryboat without extinguishing a fire, or without relighting a fire before leaving.

The theory advanced is, that there were two well known types of motor vehicles in use at the time of the enactment of the amendment of 1901, one known as the steam power machine, which used a continuous flame, and the other the one now under consideration, which only had an intermittent fire, depending upon a flame created by electric sparks, which admittedly did not constitute a flame. The Government's attorney said during the trial in this connection: "We have abandoned the idea of a spark being a flame." This admission followed a statement by Dr. Hutton that the electric sparks should not be described as a fire. In this connection, it is contended that the language of the act, especially the use of the words "all fire, if any" and "relighted" clearly contemplates the two types of automobiles, one with a fire in the ordinary and popular sense, fed by gasoline and giving forth a continuous flame, and the other, like the one in question, having no such fire; that it is only by a stretch of language that the intermittent electric flashes can be described as a "fire," which must be extinguished before entering and not relighted until after leaving the boat; that the mere circumstance of there being an insignificant residuum of carbon in the cylinder does not make these flashes a fire.

The claimant also refers to the history of the legislation which resulted in the amendment of 1901, and has furnished the court with copies of the reports of the Committees in the Senate and House of Representatives, when it was under consideration. These reports were as follows:

Calendar No. 1,889.

| 56th Congress, | | Report |
|---|---|---|
| 2d Session. | SENATE. | No. 1912. |

AMENDING SECTION 4472, REVISED STATUTES.

---

January 17, 1901.—Ordered to be printed.

---

Mr. Gallinger, from the Committee on Commerce, submitted the following
REPORT.
(To accompany S. 5427.)

The Committee on Commerce, to whom was referred the bill (S. 5427) to amend section 4472 of the Revised Statutes of the United States so as to permit steamboats to carry automobiles using gasoline as a method of propulsion, having duly considered the same, report it with an amendment, and as thus amended recommend that the bill pass.

The bill was referred to the Treasury Department for suggestions, and returned by the Secretary of the Treasury, who calls attention to the letter of the Supervising Inspector-General, which is appended and made a part of this report.

Treasury Department,
Steamboat-Inspection Service,
Office of the Supervising Inspector-General,
Washington, January 10, 1901.

Sir: I have the honor to acknowledge the receipt, by reference to this office for report, of a communication from the Committee on Commerce, United States Senate, inclosing Senate bill No. 5427, Fifty-sixth Congress, second session, "To amend section fifty-four hundred and seventy-two of the Revised Statutes of the United States so as to permit steamboats to carry automobiles using gasoline as a mode of propulsion."

I have the honor to report thereon that the apparent necessity for the proposed legislation arises from the fact that, under the construction of the Treasury Department of the provisions of section 4472, Revised Statutes, the carriage of "Camphene, * * * naptha, benzine, benzole, coal oil, crude or refined petroleum, or other like explosive burning fluids," is in terms positively prohibited on passenger steamers, and that therefore automobiles with storage tanks filled with the prohibited articles named could not be carried on such passenger steamers.

The decision of the Department referred to is given in full, as follows:

Treasury Department, July 30, 1900.

Sir: The Department is in receipt of your letter of the 27th instant, calling attention to a recent ruling of the Supervising Inspector-General of Steamboats, upon the application of the Jamestown and Newport Ferry Company, under section 4472 of the Revised Statutes, which ruling, you say, "unless modified, threatens to work great hardship to a large number of persons in this city and throughout the United States."

In reply, you are informed that, upon examination of the ruling you refer to, which is found contained in the statement indorsed upon the application of the superintendent of the Jamestown and Newport Ferry Company to the local inspectors at Providence, and by those officers referred through the proper official channel to the Supervising Inspector-General, asking if it would be illegal to carry on their ferry referred to gasoline automobiles, which application was returned through the same channel, indorsed as follows, namely, "Section 4472, Revised Statutes, absolutely prohibits the carriage of naptha, benzine, etc., under any circumstances, either as freight or stores, on passenger steamers, which includes ferry steamers and, therefore, would prohibit gasoline automobiles when their tanks are supplied with gasoline," the Department, having carefully examined the statute referred to in the indorsement quoted, can construe it in no other manner than has the Supervising Inspector-General. Nor is there any authority in this Department to modify said statute in the manner suggested by you, namely, that a requirement or rule be made "that any vehicle employing gasoline as a motive power should carry the same in a strong metal tank, securely closed, removed from any possible contact, and also plainly marked as containing inflammable substance, and that all carriages using the hydrocarbon system, upon entering ferries or vessels, should bring the motor to a full stop; and all steam vehicles, besides providing the same safeguards, should close the fuel tank and extinguish all fire."

In conclusion, you are informed that Congress alone has the power to modify section 4472, Revised Statutes, and it is respectfully suggested that application be made to it, when it meets in December next, for the relief sought for.    Respectfully,
H. A. Taylor, Assistant Secretary.

Mr. George W. Chamberlin,
President Automobile Club of America, New York, N. Y.

The provision of the bill under consideration, that all fire, if any, in such vehicles or automobiles be extinguished before entering the said vessel, and that the same be not relighted until after said vehicle shall have left the same, seems to this office to remove the greatest danger attached to the carriage of naptha or other dangerous burning fluids in the tanks of auto-

mobiles, and the fact that the quantity carried is very small removes any objections to the passage of the bill under consideration.

This office, however, in view of the possible fact that there may be owners of steamboats who, through their own fears, might object to carrying naptha or other like dangerous fluid, even in small quantities, on the steamers owned by them, but would be obliged, nevertheless, under the law relating to common carriers, if this bill should become a law in its present form, to comply therewith, thinks it would be well that such owners should be protected by having the right to refuse, without liability therefor, to carry automobiles with tanks filled with naptha or like dangerous oil.

It is therefore recommended that the bill be amended by adding thereto, after line 13, the words as follows: And it is further provided, That any owner, master, agent, or other person having charge of passenger steam vessels shall have the right to refuse to transport automobile vehicles the tanks of which are supplied with gasoline, naptha, or other dangerous burning fluids.

If it should be found that there are no owners of steam vessels who object to carrying automobiles with tanks filled with gasoline, naptha, or other dangerous burning fluids, this amendment would do no harm; if, however, there are such owners, this office thinks they are entitled to such consideration as the suggested amendment would afford them.

Very respectfully,

Jas. A. Dumont,
Supervising Inspector-General.

The Secretary of the Treasury,
Washington, D. C.

---

56th Congress,
2d Session.

HOUSE OF REPRESENTATIVES.

Report
No. 2565

PERMITTING STEAMBOATS TO CARRY AUTOMOBILES USING GASOLINE.

---

January 30, 1901.—Referred to the House Calendar and ordered to be printed.

---

Mr. Sherman, from the Committee on Interstate and Foreign Commerce, submitting the following

### REPORT

#### (To accompany H. R. 13633.)

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 13633) to amend section 4472 of the Revised Statutes, etc., beg leave to submit the following report, and recommend that said bill do pass, with an amendment.

The Senate Committee has made a report upon a bill (S. 5427) identical with this which covers the case, and this committee incorporates the Senate report as a part of its report, as follows:

The bill was referred to the Treasury Department for suggestions, and returned by the Secretary of the Treasury, who calls attention to the letter of the Supervising Inspector-General, which is appended and made a part of this report.

(Here follows the letter of the Supervising Inspector-General of January 10, 1901, quoted in the Senate Committee Report.)

The committee therefore recommends the passage of the bill with the following amendment:

"Provided further, that any owner, master, agent, or other person having charge of passenger steam vessels shall have the right to refuse to transport automobile vehicles the tanks of which contain gasoline, naptha, or other dangerous burning fluids.

It is stipulated between the parties that the burner in the steam machine which uses gasoline as a fuel has a diameter varying from 14 to 20 inches, according to the size of the vehicle and that the steady flames arising therefrom are from 1 to 1½ inches in height. It is argued by the claimant that this is the kind of an automobile which it was intended to exclude from passenger steamers and not the one using the electric sparks.

After an examination of the testimony and the briefs, I conclude:

1. There does not seem to be any doubt that the contents of the tank which formed a part of the vehicle was freight within the meaning of the statute. The amendment of February 20, 1901, to Rev. St. § 4472, provided for the transportation of vehicles carrying the prohibited dangerous articles under certain restrictions. No doubt the vehicles themselves were freight but it does not follow that their contents were not freight also. This contention does not apparently require much consideration.

2. The question whether there was a fire on the car when it went aboard and left the boat, is not so clear. It is a serious matter to determine, especially in view of the importance automobiling has assumed in recent years, whether there was an infraction of the statute such as would authorize the imposition of the penalty imposed, with all its attendant consequences. It appears by the testimony that there was no real danger to the gasoline in the tank from the sparks. There is no suggestion of danger of fire thereto through the machinery to the tank but only of a possible outward explosion, which seemingly would not immediately affect the contents of the tank although it might ultimately do so, with its attendant danger, should anything be set on fire from which a general conflagration followed. It is possible that it was in order to provide against such a contingency that the amendment contained the requirement with reference to the absolute extinguishment of fire while the car was on the boat. But whatever the intention of Congress may have been in this particular, it is really unimportant in the determination of the question here; that is, whether there was a violation of the law. It is apparent that the act of 1901 required the car to enter and leave the boat by some other method than the use of its own power and it must be presumed that Congress so intended, however inconvenient it might prove, otherwise the requirement would not have been inserted. The element of danger should not receive very much consideration from the court because the law making power has indicated unmistakably that the carriage of gasoline by passenger steamers in automobiles, required an absolute extinguishment of fire on the vehicle.

The testimony of the experts here makes it clear that when a motor of this class is under motion from its own motive power it carries a fire. Congress has made no distinction between this and the steam class of machines, the only other kind much discussed, which operates under a different method. There is much in the testimony to show a difference in favor of the gasoline machine, as far as danger of explosion is concerned from ignition of the motive liquid, because the steam machine carried constant fire and the other uses only a succession of sparks, not constituting a flame, to produce a fire. It is obvious, however,

that neither class of machines can produce motive power without heat, which, in these cases, is the result of fire, the prohibited thing.

The suggestions of counsel concerning the various possible slight infractions of the law do not bear upon the question here. It is not necessary to determine now whether they would be regarded as of a serious character or treated as de minimis. When necessary, questions arising out of such cases can be determined. It is sufficient for the present to apply the law to the case under consideration.

It will be observed that the act of 1901, leaves it optional with passenger steam vessels to carry vehicles containing the prohibited fluid, so that no liability results from a refusal to transport machines of the kind in question.

Decree for the libellants for $500.